thank you members of the court please the court my name is Thomas Jacobs it's my privilege to address you on behalf of the appellant Tiffany Imel members of the court this case involves an unreasonable application of federal law primarily pertaining to the denial of a change of venue in the wake of what was pervasive pretrial publicity in the Tucson Pima County area this case involves the murder of an individual named Kurt Imel in 1999 Mr. Imel was murdered in July the case brought to trial initially in July and January of 2001 resulted in an 11 to 1 vote in favor of conviction and therefore a mistrial was declared five weeks later the second trial was held on the heels of that first trial the trial court ignored the defense effort to advise the court of and have the court take action with regard to inflammatory media coverage resulting in a denial of due process it should be noted that these trials were close in time between the time of January 8th 2001 and February 9th of 2001 and this being the period just before and during the first trial the media coverage included over 217 television news articles and 23 newspaper stories related to the development of the facts and arguments in the case that is the positions of the parties the actual testimony that the media anticipated would be presented the day-to-day testimony of the witnesses as it was presented and a reporting in some detail regarding the details of the mistrial that was declared after the 11 to 1 vote in favor of conviction that information that was disseminated included comments from the jury foreman who was interviewed by the media the jury foreman counsel you're proceeding on implied or presumptive jury error I have arguments for both your honor for both what was the what what was the prejudicial nature of the of the factual was it not too much of it was factual your honor that is what was the inflammatory prejudicial argumentative matter that you're complaining of there were several items your honor and keeping in mind that we are using a totality of the circumstances in making this evaluation the media repeatedly referred to and characterized Dan Averitt who was the alleged hitman while proven hitman according to the jury in this matter as the brain damaged hitman initially they referred to him as the learning disabled hitman the media then proceeded to relate that that was that not factual it was factual I guess to the extent your honor that he had been in a car accident and had suffered a brain injury the impression the media was continuing to try to offer was that he was compromised in his ability to refuse the job he was offered by these two ladies by Teresa Eimel and Michael who is my client's mother and Tiffany Eimel my client the media went farther than that on that point they talked about Mr. Averitt's family and I believe the fact that his daughter was killed and his mother was injured in the accident and they went into some depth this became the state's star witness Dan Averitt and in fact there was the testimony of Dan Averitt and the testimony of Troy Burling who was my client's boyfriend both of whom were present at the time of the murder although Mr. Averitt was the only one who had contact with the victim was essentially the state's case in this matter trying to prove a conspiracy that these ladies had gotten together gotten Averitt involved and Burling involved as their drug dealer to kill Mr. Eimel for insurance money I'm still having difficulty grasping what there was it was not factual about the characterization of Mr. Averitt by the media I guess there are there are two ways to look at that your honor it was inflammatory and it was I don't believe the media said anything that was strictly untrue about Mr. Averitt but it was presented in an inflammatory deliberately inflammatory manner and that is from which the prejudice arises I don't believe that the appellate information was that these two women took advantage of this brain damaged individual to coerce him to do the killing I think that and that they were essentially the brains of the operation almost literally and thus because he was blamed on them correct exactly your honor in addition to that differ appreciably from the case that was presented at trial the case that be present was presented at trial did not emphasize Mr. Averitt's lack of a leadership role in a sense or his strictly speaking the faculty was brain damaged it was brought to the jury's attention that he had been in an accident because of the issues that would relate to his cognitive processes and his ability to recall events so the jury was made aware of that to the extent that in the day-to-day coverage preceding the second trial and during the first trial the media almost on a daily basis made reference to the the brain-damaged hitman was certainly something that that could not or should not have been ignored by the Arizona courts and had Everett pled guilty Everett pled guilty Bertling pled guilty and both agreed to testify so the state's position was that they were all guilty yes that is correct well how is that really inconsistent with the publicity well the publicity I'm pointing out your honor is not that they were not into that they were in cahoots with each other that this was not a conspiracy the publicity was that the girls had no contact with the victim and were charged with conspiracy their defense was we didn't conspire to do anything and the state's position was yes you did in fact you were in charge and look at this guy he's the brain-damaged hitman they again they were making their argument based on Everett's testimony but with the media attention the impression that anybody who was listening to that would get is look this guy is this guy is not a rocket scientist and beyond that he's brain-damaged that's what we've heard in the media in 230 plus or 223 plus articles I think I said 217 actually in 23 newspaper articles all of that all of that created an atmosphere where essentially you had a storm of media attention bringing out that fact and that's I've just gotten to the first the first item that I believe was prejudicial to Ms. Imel because that was followed up by the hung jury and the jury foreman's comments that my jury didn't do its job and I hope the next jury does which when you get to the point where you've had a trial that lasted weeks and you have a second trial within five weeks of that and there just aren't any any of these cases that we've to you where the two trials have been so close in time I mean you look at the Riddell case where it was four years apart and you look at the the other cases that were emphasized there you have cases with retrials and the courts that have found that there's no outrageous effect of or no effect of the outrageous publicity in some of those cases they often will emphasize for example in the patent case that's cited by the state on this matter that's the case they're relying on primarily for the notion that this was factual coverage in that case the court noted that that that part of the problem was not just it was factual but that after four years even though some jurors recalled the first trial it had basically faded from their memories this was five weeks later in the same city in the same county and if you look at the jurors at that point who were who were asked about this there was a pool of 60 which was on the small side for pool so that set for that type although if you looked at Murphy I believe they had a pool of 78 of the 60 in the pool 30 indicated that they had heard the media coverage that they basically wouldn't then heard about it or follow the media coverage of the first trial which was again very proximate of those half of them said they couldn't be fair because of the media coverage that they heard now that's 25% of the total pool said that because of media coverage they heard about the case they could not be fair now we have to what happened to those people well they were dismissed for that reason but the problem is that when when you look at the two arguments one presumed prejudice and the other actual prejudice one of the things you look at when you're looking at actual prejudice is percentages when you're looking at presumed prejudice you're looking at whether the media coverage was so pervasive and contained so much information that was inflammatory that a fair trial simply could not have been had and you've got stuff like that where you look at for example the the case of Riddell versus Louisiana you've got a movie of a jailhouse confession was held to be outrageous pretrial publicity but that's strictly factual your honors the fact that the individual confessed and that was introduced at the trial but just the fact that they made a videotape and broadcast it just three times on the television for people to see was enough for the court to say this was pervasive and in that community it was unreasonable and under due process we can't allow that kind of that kind of media coverage in a case and let the case go forward in the same community there were so many options in this case for the trial court to move this to another even another county would have been sufficient it wouldn't even have to been necessarily like Maricopa County which would have a lot of resources there's there's a couple dozen counties they could have moved it to but they simply didn't do it you are now over your time I'm sorry your honor let's let you have a question I was going to say there was extensive word here and everybody who was put on the jury said they could simply either they hadn't heard the publicity or they could put it aside yes so do we just say the voir dire process is not acceptable no your honor and I know I'm over time I'll make this very brief if you look at that kind of analysis the courts have said that you have to look at essentially how many of the jurors admitted to hearing the coverage what the coverage was like and under the totality of the circumstances whether given the number of jurors who really believe that the rest of them could have been okay thank you thank you your honors thank you for your argument we're here for counsel for the state good morning radio groceries Louisiana involved a detailed confession by the defendant to bank robbery kidnapping and murder and it was televised to more than confession left in such an indelible impression of petitioner's guilt that it converted the it converted the the trial that followed to just a hollow formality the televised confession actually actually became in a very real sense his truck the trial itself and so it basically upset the the subsequent filing to a hollow formality and this is not what occurred in this case to prevail on a claim of excessive or inflammatory pretrial publicity the defendant must show either actual or presumed prejudice actual prejudice is actual partiality or hostility that could not be set aside the defendant does not argue actual prejudice as she has never done so and she in fact could not do so because each juror who served on her jury assured the trial court of his or her ability to serve impartially so instead of claiming actual prejudice the petitioner are reforced entirely to a claim of presumed prejudice presumed prejudice however is found only where there was such a probability of prejudice notwithstanding the jurors assurances of impartiality that the proceeding is deemed inherently or fundamentally unfair the publicity the Arizona Court of Appeals correctly found and as this court has recognized in in questioning the news reports that issue were primarily factual and they basically repeated or summarized the fact that were presented at petitioner's first trial even a news report stating that petitioner had hired a brain damaged hitman to kill her stepfather was essentially true because petitioner and her co-conspirators in fact did hire a mentally retarded person to kill her the news reports that can be arguably characterized as inflammatory were those that issued immediately after petitioner's first trial resulting in a deadlocked jury I take it the I've forgotten his name let me look the person who committed the killing Averett Daniel Averett he did plead guilty to a criminal offense is that correct yes he did so the state did not take the position that he was mentally incompetent or incapable of committing a criminal offense well there was evidence that admitted to the effect that mental capacities were diminished somewhat due to I think a child and injury did the presentation at this defendants trial take the same line that the publicity is alleged to have this woman and her mother took advantage of somebody who may not have been responsible or capable of understanding what was going on I'm sorry you mean what the state position that they essentially took advantage of him yes my impression from from the argument we just heard from petitioner from appellant was that the community was left the impression that that miss Amell and her mother took advantage of of Averett is that the same position is that the evidence that was put on during the trial of this case my recollection it was that I'm yeah it was the evidence of brain damage was admitted more about just on a factual basis what should the extent to which they took advantage of it I can't recall at this point I'm not too sure how much this factors into the analysis though because it is still a strictly factual well I guess the argument or the impression that I'm left by petitioner's argument is that the community is inflamed not just by the fact of the killing but of miss Amell and her mother taking advantage of somebody else to thereby fanning the flames and so I pose the question to petitioner's attorney isn't that the evidence that was submitted and he suggests no not so much that the state's case at trial did not focus on the taking advantage part as much so I pose the same question to you I don't I don't believe so I don't think it's not making our emphasis that's why even considering that part in in the totality of the circumstances for example that the news reports of the brain damage hit man and the other specific allegation of inflammatory content relates to the statement that a trial ended in a deadlock jury to the effect that he thought the jury had not done its job and he hoped that the next jury would do the job right that that is the only news account that can be characterized as potentially inflammatory but that was isolated in nature and it does not demonstrate community saturation what presidential or inflammatory content further in indicated possible exposure to those statements and he assured the trial court of his ability to serve impartially there was a six-week time left between the end between a news report that issue here and the commencement of petitioner's second trial petitioner does not show extensive coverage during this six-week lap in strobel in strobel versus california 343 us 181 the supreme court recognized a six-week lasting coverage at accounting against the finding of presumed prejudice finally and unsurprisingly the trial court and the parties had no difficulty in selecting an impartial jury for petitioner's trial in urban versus doubt in contrast it was difficult to find a partial juror because of the nature and the extent of the inflammatory content which resulted in almost 90% of the prospective jurors carrying opinions regarding the defendant's bill eight of the twelve who served on the jury thought him guilty at the outset in murphy versus floyd in contrast the trial court is that the supreme court found that excusing 20 out of 78 juror because of their inability to set aside their opinion it by no means suggested a community so poisoned against the defendant as to impeach the seated jurors of impartiality here the petitioner's initial jury pool consisted of 120 prospective jurors approximately a half of which were excused for unrelated reasons approximately 40 who were questioned on the issue of pre-trial publicity stated that he had been exposed to media account of petitioner's case to varying level 13 of them expressed doubt about their ability to serve impartially and they were immediately excused for cause as in murphy versus so poisoned against the petitioner so as to discard the other jurors assurances of neutrality particularly considering the strictly factual nature of the news reports that issue petitioner's counsel questioned the prospective jurors extensively regarding their prior exposure and passed jury panel after moving to strike only one juror for cause on different ground that particular juror was eventually removed for the use of a peremptory strike now petitioner makes no claim has never claimed that a trial court unreasonably unreasonably limited her boy diary with respect to pre-trial publicity and so for those reasons the Arizona courts did not unreasonably apply supreme court precedent in rejecting this claim thank you okay um I have only one minute after I would I would like to briefly touch upon the juror misconduct issue the second certified issue this issue revolved mostly around one statement that one juror said to another during trial apparently one juror overheard her son say she she had overheard her son say to somebody else that petitioner's trial involved two two methods who had watched something do this statement did not prejudice petitioner at all the Arizona Court of Appeals okay the Arizona Court of Appeals pointing out number one when the trial court learned of that comment from the juror the trial court immediately questioned the juror and she said that she was not influenced by what she heard her son say second the statement in question was primarily factual again because petitioners case in fact did involve a conspiracy of methamphetamine user who had arranged a murder and evidence to that effect had already been admitted at trial by the time of the statement at issue third the trial court instructed the juror that they were to find the fact based solely on the evidence admitted at trial and petitioner offers no evidence to show that the jurors failed to heed this admonition thank you thank you we thank both counsel for their helpful arguments the case just argued is submitted
judges: Fletcher B. , Clifton, Bea